UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------X

THALIA GRAVES,

                Plaintiff,                                      No. 24 Civ. 7201

        v.

SEAN COMBS, JOSEPH SHERMAN, DADDY'S      **COMPLAINT AND**
HOUSE RECORDINGS INC., CE OPCO, LLC d/b/a   **DEMAND FOR**
COMBS GLOBAL f/k/a COMBS ENTERPRISES LLC,  **JURY TRIAL**
BAD BOY ENTERTAINMENT HOLDINGS, INC.,
BAD BOY PRODUCTIONS HOLDINGS, INC.,
BAD BOY BOOKS HOLDINGS, INC., BAD BOY
RECORDS LLC, BAD BOY ENTERTAINMENT LLC,
BAD BOY PRODUCTIONS LLC, AND
ORGANIZATIONAL DOES 1-10,

                Defendants.

----------------------------------------------------------------X

        Plaintiff Thalia Graves ("Plaintiff"), by and through her attorneys, Allred Maroko & Goldberg and Cuti Hecker Wang LLP, for her Complaint alleges as follows:

## <u>INTRODUCTION</u>

        1.     In or around the summer of 2001, Plaintiff's life was violently knocked off course when Defendants Sean Combs and Joseph Sherman viciously raped her at the Bad Boy Records studio in New York City.

        2.     Plaintiff was twenty-five at the time and dating one of Combs' employees, a relationship that Combs exploited to lure Plaintiff into meeting him and Sherman alone.  Once they successfully sequestered Plaintiff, Combs and Sherman gave Plaintiff a drink, likely laced with a drug that eventually caused her briefly to lose consciousness.  She awoke to find herself bound and restrained.

3.      Combs and Sherman proceeded to brutally sexually abuse and violate Plaintiff. Combs mercilessly raped her, anally and vaginally.  Sherman forcefully slammed Plaintiff onto a table, slapped her, and repeatedly thrust his penis into her mouth.  Both men were undeterred by Plaintiff's cries for help throughout the attack.

4.      Plaintiff never recovered from Defendants' violent rape.  She had suicidal thoughts and ideation and has received extensive psychological treatment because of Defendants' attack.  For decades, she remained silent and did not report the crime out of fear that Defendants would use their power to ruin her life, as they had repeatedly, explicitly threatened to do.  To this day, Plaintiff suffers from severe depression, anxiety, and panic attacks, and still lives in fear of Defendants.

5.      Any progress Plaintiff had made in healing from the attack over the years was dramatically reversed on or around November 27, 2023, when she learned for the first time that Combs and Sherman had video-recorded the horrific rape twenty-two years before and had shown the video to multiple men, seeking to publicly degrade and humiliate both Plaintiff and her boyfriend.

6.      Plaintiff could not believe that Defendants would record themselves committing such a gruesome crime and then proceed proudly and widely to disseminate the recording of it. She was distraught and sunk into a deep depression.  She again considered ending her life.

7.      This action seeks redress for Defendants' brutalizing, misogynistic, and violent attacks on Plaintiff, starting in 2001 with their rape and continuing in the subsequent years as they compounded her humiliation by showing the video of the sexual assault to others.

## **PARTIES**

8.      Plaintiff Thalia Graves is a female who resides in Harris County, Texas.

9.    Defendant Sean Combs is a male who, on information and belief, resides in Los Angeles County, California, though at the time of filing was incarcerated in the Metropolitan Detention Center in Brooklyn.  On information and belief, at all relevant times Combs owned and/or controlled Bad Boy Entertainment Holdings, Inc., Bad Boy Productions Holdings, Inc., Bad Boy Books Holdings, Inc., Bad Boy Records LLC, Bad Boy Entertainment LLC, Bad Boy Productions LLC, (collectively "Bad Boy"), Daddy's House Recording Studio, Inc., and CE OPCO, LLC d/b/a Combs Global, f/k/a Combs Enterprises LLC (all together, the "Combs Corporations").  The facts of Combs' ownership and titles at the Combs Corporations enabled him to commit the unlawful sexual violence against Plaintiff described herein and/or to harass and subsequently intimidate her into silence after the rape.

10.    Defendant Joseph Sherman, a/k/a "Big Joe" is a male who, on information and belief, resides in Westchester County, New York.  On information and belief, Sherman was employed by Combs and/or by the Combs Corporations during the relevant period.  The facts of Combs' ownership and titles and Sherman's titles at the Combs Corporations enabled Sherman to commit the unlawful sexual violence against Plaintiff described herein and/or to harass and subsequently intimidate her into silence after the rape.

11.    Defendant Daddy's House Recordings, Inc. ("Daddy's House") is a domestic business corporation that is incorporated in New York and on information and belief now has its principal place of business at 9255 Sunset Boulevard, 2nd Floor, West Hollywood, California 90069.  Combs is listed as the CEO in public filings, with a listed address of 1710 Broadway, New York, New York 10019.  At the time of the events alleged herein, Daddy's House was a world-class recording studio owned by Combs located at 321 W 44th Street, Suite 201, New York, New York 10036.  On information and belief, at all relevant times, Bad Boy and Combs

together owned and operated Daddy's House.  On information and belief, the Bad Boy recording studio was located on the premises of Daddy's House.  Combs and Sherman used the Daddy's House premises and their ownership and titles at Daddy's House to commit the unlawful sexual violence against Plaintiff described herein and/or to harass and subsequently intimidate her into silence after the rape.

12.     Defendant CE OPCO, LLC d/b/a Combs Global, f/k/a Combs Enterprises LLC ("Combs Global") is a limited liability company incorporated in Delaware that has its principal place of business at 9255 Sunset Boulevard, 2nd Floor, West Hollywood, California 90069.  On information and belief, all members of Combs Global are citizens of Delaware, New York, and/or California.  On information and belief, Combs Global is an alter ego for Combs and/or a successor in interest to Combs' other corporations and/or was established or used by Combs for the purpose of moving, disposing of, and/or insulating his assets, including in connection with his criminal activities and to avoid liability.  Combs Global currently owns, controls, and/or oversees Bad Boy and Combs' other business ventures in the music, fashion, fragrance, beverage, marketing, film, television, and media industries.

13.     As part of his renowned Bad Boy record label and brand, Combs has established several corporate entities under the "Bad Boy" name over the past few decades, including but not limited to Bad Boy Entertainment Holdings, Inc., Bad Boy Productions Holdings, Inc., Bad Boy Books Holdings, Inc., Bad Boy Records LLC, Bad Boy Entertainment LLC, and Bad Boy Productions LLC (together, "Bad Boy").  On information and belief, all Bad Boy corporate entities are alter egos for Combs, are controlled and/or directed by Combs, and/or were established or used by Combs for the purpose of moving, disposing of, and/or insulating his assets, including in connection with his criminal activities and to avoid liability.  On information

and belief, all active Bad Boy entities are now owned and/or controlled by Combs and/or by Combs Global. Combs and Sherman used the Bad Boy premises/recording studio and their ownership and titles at Bad Boy to commit the unlawful sexual violence against Plaintiff described herein and/or to harass and subsequently intimidate her into silence after the rape.

a. Defendant Bad Boy Entertainment Holdings, Inc. is a domestic business corporation incorporated in New York, that on information and belief now has its principal place of business at 9255 Sunset Boulevard, 2nd Floor, West Hollywood, California 90069. Bad Boy Entertainment Holdings, Inc. is part of the Bad Boy enterprise founded and owned by Combs, and on information and belief is now owned and/or controlled by Combs and/or by Combs Global. Combs is listed as the CEO in public filings, with a listed address of 1710 Broadway, New York, New York 10019.

b. Defendant Bad Boy Productions Holdings, Inc. is a domestic business corporation incorporated in New York, that on information and belief now has its principal place of business at 9255 Sunset Boulevard, 2nd Floor, West Hollywood, California 90069. Bad Boy Productions Holdings, Inc. is part of the Bad Boy enterprise founded and owned by Combs, and on information and belief is now owned and/or controlled by Combs and/or by Combs Global. Combs is listed as the CEO in public filings, with a listed address of 1710 Broadway, New York, New York 10019.

c. Defendant Bad Boy Books Holdings, Inc. is a domestic business corporation incorporated in New York, that on information and belief now has its principal place of business at 1440 Broadway, 3rd Floor, New York, New York 10018.

Bad Boy Books Holdings, Inc. is part of the Bad Boy enterprise founded and owned by Combs, and on information and belief is now owned and/or controlled by Combs and/or by Combs Global. The CEO listed on public filings is Eddie Norward Jr., with a listed address of 1710 Broadway, New York, New York 10019, the same address listed for Sean Combs in public filings for Bad Boy Entertainment Holdings, Inc., Bad Boy Productions Holdings, Inc., and Daddy's House Recordings, Inc.

d. Defendant Bad Boy Records LLC is a Delaware limited liability company that on information and belief is headquartered in New York and/or California. On information and belief, all members of Bad Boy Records LLC are citizens of Delaware, New York, and/or California. On information and belief, Bad Boy Records LLC is part of the Bad Boy enterprise and/or a successor-in-interest to other Bad Boy Defendants that comprise the Bad Boy enterprise founded and owned by Combs. On information and belief, Bad Boy Records LLC is now owned and/or controlled by Combs and/or by Combs Global.

e. Defendant Bad Boy Entertainment LLC is a New York limited liability company that on information and belief is headquartered in New York and/or California. On information and belief, all members of Bad Boy Entertainment LLC are citizens of New York and/or California. Bad Boy Entertainment LLC is part of the Bad Boy enterprise and/or a successor-in-interest to other Bad Boy Defendants that comprise the Bad Boy enterprise founded and owned by Combs. On information and belief, Bad Boy Entertainment LLC is now owned and/or

controlled by Bad Boy Entertainment Holdings, Inc. and/or by Combs, and/or by Combs Global.

    f.   Defendant Bad Boy Productions LLC is a New York limited liability company that on information and belief is headquartered in New York and/or California. On information and belief, all members of Bad Boy Productions LLC are citizens of New York and/or California. Bad Boy Productions LLC is part of the Bad Boy enterprise and/or a successor-in-interest to other Bad Boy Defendants that comprise the Bad Boy enterprise founded and owned by Combs. On information and belief, Bad Boy Productions LLC is now owned and/or controlled by Combs and/or by Combs Global.

14.    Defendants Organizational Does 1-10 are currently unknown entities who were owned by and/or employed Defendants Combs and/or Sherman and enabled the commission of the conduct complained of herein. As the parties engage in discovery, Plaintiff retains the right to amend the Complaint to add these entities by name.

15.    Each of the Combs Corporations (a) aided and abetted Combs and Sherman in committing the unlawful sexual violence against Plaintiff described herein and/or in harassing and subsequently intimidating her into silence after the rape, (b) provided Combs and Sherman with the studio/office space where they committed the rape, and/or with chattel including recording equipment, storage equipment, etc. to record the rape and disseminate it; (c) are alter egos for Combs, completely dominated by him and used for his personal interests and to engage in wrongdoing which harmed Plaintiff and others, and/or (d) serve or have served as vehicles for Combs to move, dispose of, and/or insulate his assets, including in connection with his criminal activities and to avoid compensating the victims of his many crimes, including Plaintiff.

## JURISDICTION AND VENUE

16.     This Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1332 because this case is between citizens of different states, and the amount in controversy exceeds $75,000.

17.     This Court has specific personal jurisdiction over Defendants because the acts giving rise to Plaintiff's claims took place in New York State, and because several of the Defendants are domiciled in New York State and/or regularly transact business in New York State.

18.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claims occurred in this District.

## JURY DEMAND

19. Plaintiff hereby demands a trial by jury on her claims in this action.

## FACTUAL ALLEGATIONS

***Background***

20.     Plaintiff's family immigrated to New York City when Plaintiff was a teenager in connection with her mother's work.  Her family ultimately settled in Rego Park, Queens, where she completed her education, and where she was living when she met Combs.

21.     Defendant Combs, also known by his stage names Puff Daddy, Puffy, P. Diddy, Diddy, Brother Love, or Love, is a prominent rapper, record executive, and businessman.  He rose to fame in the 1990s with his record label Bad Boy, and continued to be a notable figure in the music and entertainment industry in the following years.  Combs has continued to amass wealth and power through his business ventures in the music, fashion, fragrance, beverage, marketing, film, television, and media industries.

22.     The Bad Boy enterprise is the foundation of Combs' wealth and power.  Bad Boy has sold over 500 million records through its lucrative distribution deals with the top music companies in the world, and has signed acclaimed hip hop and R&B artists, including The Notorious B.I.G., Mary J. Blige, and Usher.  Combs later founded CE OPCO, LLC a/k/a Combs Enterprises, later rebranded as Combs Global, to serve as a home for his portfolio of businesses, including his investments in the music, fashion, fragrance, beverage, marketing, film, television, and media industries.  On information and belief, Combs Global houses Bad Boy and other notable businesses such as Combs' fashion line Sean Jean, his vodka line Cîroc, and his cable media company REVOLT MEDIA.

23.     As detailed below, *see infra* ¶¶ 57 through 64, Combs has a long history of violence and of abusing and raping women, and there have been several civil lawsuits filed against Combs in the past year alleging sexual violence and abuse.  On September 16, 2024 Combs was arrested and charged with racketeering and sex trafficking.  He was denied bail.

24.     Defendant Sherman, also known as "Big Joe," was employed by Combs as his bodyguard and head of security during the relevant time period described herein and served in various roles in the Combs Corporations.  Sherman is also the founder of Rhymes N Dimes Magazine, Inc., a New York State registered corporation, and through or in connection with that company produces and distributes pornography.  On information and belief, he has often distributed videos of his and/or his friends' sexual assaults through his pornography company.

25.     Plaintiff met Defendant Combs in or around late 1999 or early 2000 through her then-boyfriend, who was an executive at Bad Boy.  In addition to working together, Plaintiff's boyfriend and Combs had a close personal relationship.  Plaintiff frequently visited her boyfriend at the Bad Boy studio in New York City and attended events hosted at Combs' residences.  Over

time, Plaintiff became familiar with Combs, and he knew about her relationship with her boyfriend.

***Defendants Trick, Drug, and Violently Rape Plaintiff***

26.     In or around the summer of 2001, Plaintiff received a call from Combs concerning her boyfriend's employment at Bad Boy.  He told her he wanted to meet with her in person to discuss her boyfriend's supposed performance issues.  Her boyfriend was determined to climb up the ladder at Combs' records label and as his romantic partner, Plaintiff was committed to helping him.  Plaintiff agreed to meet with Combs.  In retrospect, it was evidently a sick and twisted way of using his ownership of and title at Bad Boy and its affiliate entities to abuse Plaintiff and also show his power and ability to humiliate her boyfriend, his executive.

27.     A few hours later, Combs arrived at Plaintiff's mother's residence in Queens with Sherman, who was employed by Combs as his bodyguard at the time.  Sherman was driving an SUV and Combs was in the backseat.  After Plaintiff entered the vehicle, Combs offered her a glass of wine, which she accepted.

28.     Combs began discussing his alleged concerns about her boyfriend's performance at work.  Meanwhile, as Plaintiff drank what had been handed to her, she started to feel lightheaded, dizzy, and physically weak.  In retrospect, it is clear that Combs had caused a drug to be put into Plaintiff's drink, as a few sips of wine had never impacted her that way.

29.     Combs and Sherman drove Plaintiff to the Bad Boy studio in Manhattan.  When they arrived and Plaintiff tried to get out of the car, she realized that she was feeling odd, and found it difficult to walk.  She assumed this was her fault, and did her best to act normal, and followed Combs as he led her eventually to a couch in a private room in the Bad Boy studio. She later came to understand this was Combs's personal lounge and office at the Bad Boy studio.

Combs sat on the couch next to Plaintiff and continued speaking to her. Plaintiff began feeling even more woozy and sedated. She then lost consciousness.

30.     When Plaintiff regained consciousness, she was naked, and her hands were tied behind her back with what felt like a plastic grocery bag. Plaintiff shouted for help. In response Sherman lifted her up from the couch and forcefully slammed her face down on what was apparently a pool table. Shortly thereafter, Combs entered the room naked.

31.     Combs reached for a container of lubricant that smelled like menthol, and proceeded to apply it to his penis. He then bent Plaintiff over the table causing her feet to dangle above the floor, forcefully held her down, and anally penetrated her without her consent. Plaintiff is 4 feet 11 inches tall and weighed only 103 pounds at the time. Plaintiff was unable to move, totally overpowered physically, in addition to being drugged and bound.

32.     Plaintiff screamed out in pain, but Combs continued to violently anally rape her. He easily physically overpowered her, smashing her head down on the pool table while she futilely tried to wriggle out from under him.

33.     During the brutal attack, Plaintiff vomited into her mouth and on the table. At one point, she involuntarily defecated. Combs was undeterred. He wiped himself off, applied more lubricant, and without any acknowledgement of Plaintiff's distress, proceeded to vaginally penetrate Plaintiff.

34.     Plaintiff experienced intense pain and burning sensations in her vagina and anus. Plaintiff continued to scream for help because of the extreme pain she felt as Combs penetrated her over and over. She then lost consciousness again.

35.     The next time she regained consciousness, Plaintiff was on the couch and Sherman was standing in front of her with his bare penis in her face. Sherman slapped Plaintiff

in the face and forcefully inserted his penis into her mouth. Sherman slapped her yet again, and continued to thrust his penis into Plaintiff's mouth. Plaintiff once again lost consciousness.

36.    When she next awoke, Plaintiff was on the couch naked and alone in the room.

37.    Plaintiff was in severe pain and distress. Her anus and vagina burned, her face and wrists were bruised, and her genital area smelled strongly of menthol. She felt a liquid, presumably semen, dripping out from inside of her.

38.    Her dress was thrown over her, her purse was on the couch next to her, and her bra was on the floor nearby. She did not see her underpants.

39.    Terrified that Combs and Sherman would return, Plaintiff quickly got dressed and bolted out of the studio room where she had been raped.

40.    Still dizzy and weak, Plaintiff called a livery driver that her family regularly hired and knew well. The driver picked her up from outside Bad Boy studio. She was disheveled, crying uncontrollably and suffering from agonizing pain.

41.    The driver drove her to the hospital and tried to convince her to report the rape and get a rape kit, but she was unable to leave the car, "shaking and crying hysterically" and terrified of what Combs would do to her and her family if she reported him.

***The Aftermath and Impact of the Rape on Plaintiff***

42.    Plaintiff sustained serious physical injuries in the aftermath of the rape. As noted, she had burning in her vagina and anus, and bruising on her wrists and face. In the days after the assault, she suffered prolonged anal bleeding and hemorrhoids.

43.    Because of Combs' power and notoriety, Plaintiff was afraid to report what had happened. She was involved in a contentious divorce and custody battle at the time and feared that reporting the rape would cause her to lose custody of her young child.

44.     Plaintiff confided in her boyfriend, Combs' employee, hoping he would comfort and support her.  But instead of supporting her, he discouraged her from disclosing the assault, telling her that it could negatively impact his own career.

45.     Following the assault and multiple times over the years, both Combs and Sherman contacted Plaintiff and warned her to be silent, threatening repercussions including Plaintiff potentially losing custody of her son if she ever disclosed the assault.  Because of their enormous power in the industry, including through their ownership of and positions at the Combs Corporations, Plaintiff knew that they could follow through on their threats.

46.     Plaintiff told close friends that Combs and Sherman had drugged and savagely raped her, but as noted was afraid to report the attack to the police out of fear that Defendants would follow through on their threats.  She was even afraid to stay in New York City while Combs lived there, so with the help of a friend, she fled to Pennsylvania.  Plaintiff has in fact relocated multiple times throughout the years in an effort to stay away from Combs.

47.     Plaintiff has suffered irreparable harm because of the brutal rape by Defendants Combs and Sherman.  She suffers from severe depression and post-traumatic stress disorder. She also has suffered suicidal ideation and intrusive thoughts, and has attempted to end her life.

48.     Plaintiff lives in constant fear.  She struggles with hypervigilance and experiences anxiety and panic attacks in social settings, preferring to be alone.  Her need to hide to feel safe has strained her relationships with friends and family.

49.     Defendants' rape has also impacted Plaintiff's ability to engage in sexual acts with her intimate partners.  To this day, she cannot be in certain sexual positions without experiencing flashbacks of Combs violently penetrating her from behind.

13

*Plaintiff Learns that the Rape was Videotaped and Published*

50.    On or around November 27, 2023, all the trauma of the rape came flooding back to Plaintiff when her former boyfriend revealed to her for the first time that Combs and Sherman had recorded and published the video of the horrific attack.

51.    Earlier that month, Cassie Ventura had come forward and filed a lawsuit against Combs for subjecting her to years of severe sexual and physical abuse. The case had been settled one day after it had been filed. Plaintiff's former boyfriend invoked Ms. Ventura's effort to hold Combs' accountable and for the first time confessed that years earlier, but sometime after the actual rape itself, Sherman and Combs had showed him and a group of men – some of whom were also employed by Combs' companies and/or their related entities – the video of Plaintiff being raped. He disclosed that Combs and Sherman had a pattern and practice of non-consensually recording women engaging in sexual acts and making those videos available to the public, including by selling tapes as pornography. A Bad Boy artist later corroborated in a text message that Sherman "use[d] to sell porn of him doing this to chix" and that Sherman "did that to a lot of women."

52.    Plaintiff's former boyfriend reported that he and the other men watched the recording of Plaintiff's rape on a handheld camera while at the Bad Boy studio in New York City. Combs, Sherman, and some of the other men made derogatory comments about the former boyfriend's relationship with Plaintiff, in an attempt to shame him into cutting ties with Plaintiff and to cause her further emotional harm and embarrassment.

53.    On information and belief, Defendants continued to show the video of the rape to others over the years and through to the present and/or sold the video as pornography.

54. Plaintiff was shocked and horrified that Combs and Sherman had recorded and publicized the video of them raping her.  After over two decades spent trying to heal and distance herself from the experience, Plaintiff was devastated by the news.  She felt as if her life had been turned upside down, again, and like the rape had been happening again and again even as she was trying to forget it.  She experienced acute psychological distress, plunging into a deep depression and having suicidal ideations.  She felt intense fear, anger, and anxiety.

55. Plaintiff lives with the distress of knowing that the video of her brutal rape is in circulation and that anyone, including her family, friends, and peers, could view it at any time.

56. In a panic, she reached out to Sherman after learning about the tape, hoping to protect herself from further humiliation by convincing him to destroy the tape or provide it to her, but he did not respond.

### *Combs' Pattern and Practice of Violence and Abuse, Including of Drugging, Raping, and Secretly Recording His Violence Against Women*

57. Combs has a long history of violence and abuse.  This long-standing behavior has been enabled by his ownership of and titles at the Combs Corporations and their affiliated entities and the immense wealth and power he has amassed through such business dealings.

58. Among a long list of allegations:  In 1996 he was found guilty of criminal mischief for threatening a photographer from the *New York Post* with a gun.  In 1999 he was arrested and charged with second-degree assault and criminal mischief in connection with the beating of a record executive, and arrested again the same year in relation to a shooting at a club in New York; that female victim has consistently stated that Combs shot her in the face at point-blank range.

59. Combs also has a pattern and practice of using his power and influence in the music and entertainment industries to submit people to sexual violence, often drugging his

victims and/or coercing them to consume drugs and recording the assaults, often without the victim's knowledge, just as he did with Plaintiff. In the past year, a number of these people have come forward to accuse Combs of sexual assault, violent rapes and/or sex trafficking:

a.  In November 2023, three lawsuits were filed against Combs under the New York Adult Survivors Act. As noted above, Cassie Ventura, an artist signed to Bad Boy, sued Combs in the Southern District of New York for rape and years-long physical abuse, facilitated in part by Combs having supplied Ms. Ventura with copious amounts of drugs and urging her to take them, beginning in 2006. Combs regularly recorded Ms. Ventura engaging in sex acts he forced her to engage in.

b.  Joi Dickerson-Neal, who had appeared with Combs in a music video, sued Combs in New York County Supreme Court alleging Combs drugged her, sexually assaulted her, and secretly recorded the assault in 1991.

c.  Liza Gardner, whom Combs met at an event hosted by a record label affiliated with Bad Boy, sued him for raping her and a friend in 1990 or 1991 when she was only 16.

d.  In December 2023, an anonymous plaintiff sued Combs in the Southern District of New York for drugging and gang-raping her in 2003 when she was only 17 years old. That complaint alleges that Combs and one of his business associates and employees lured the plaintiff to Daddy's House through their affiliations with the Bad Boy enterprise and its related entities, and raped her at the same location where Plaintiff was raped.

e.  In February 2024, Rodney "Lil Rod" Jones, one of Combs' former producers, sued Combs for forcing him to engage in unwanted sex acts and sex trafficking,

among other allegations.  In that complaint, Mr. Jones alleges that Combs regularly drugged others including minors by giving them alcoholic beverages laced with ecstasy and other date rape drugs, that he believes he himself was drugged by Combs, and that Combs routinely secretly recorded sexual encounters.

f.  In May 2024, two more women sued Combs.  Former model Crystal McKinney sued Combs in the Southern District of New York for drugging and sexually assaulting her at his recording studio in 2003.  Combs had promised to help advance Ms. McKinney's modeling career, a promise she believed he would fulfill because of his ownership of and/or titles at the Bad Boy enterprise and its related entities.  April Lampros, an intern at Arista Records, which was an owner of Bad Boy, also sued Combs in May 2024 in New York County Supreme Court for raping her on multiple occasions, secretly filming at least one of the assaults, and showing the recording to multiple people.  Ms. Lampros alleges that Combs ordered her to take drugs on one occasion before he raped her.

g.  In July 2024, former adult film star Adria English – who was employed by Combs as an entertainer at his infamous White Parties that brought together the biggest names in the music and entertainment industries – sued Combs in the Southern District of New York for sex trafficking, alleging that he required her to consume drinks laced with ecstasy and secretly recorded the sexual acts he forced her to engage in.

h.  In September 2024, singer and songwriter Dawn Angelique Richard also sued Combs.  Richard was employed by Combs as part of the girl group Danity Kane, formed by Combs, and later as a key member of Combs' band Diddy – Dirty

Money.  She sued Combs in the Southern District of New York for sexual assault, false imprisonment, and for subjecting her to hostile working conditions due to her gender, including degrading comments and threats.  Ms. Richard has alleged that Combs regularly supplied others including minors with copious amounts of drugs and alcohol, and subjected them to sexual acts while they were sedated and/or unconscious due to the drugs and alcohol.

60.     On September 16, 2024, Combs was arrested at a Manhattan hotel after a grand jury indicted him on charges of sex trafficking and racketeering.  The indictment details how "[f]or decades, [Combs] abused, threatened, and coerced women and others around him to fulfill his sexual desires, protect his reputation, and conceal his conduct."  *See United States of America v. Sean Combs, a/k/a "Puff Daddy," a/k/a "P. Diddy," a/k/a "Diddy," a/k/a "PD," a/k/a "Love,"* Index No. 24 Crim. 542, Indictment (SDNY), at ¶ 1.[1]  It notes that Combs' abuse of women was enabled by "the employees, resources, and influence of the multi-faceted business empire that he led and controlled—creating a criminal enterprise whose members and associates engaged in, and attempted to engage in, among other crimes, sex trafficking, forced labor, kidnapping, arson, bribery, and obstruction of justice."  *Id.*

61.     The indictment notes that Combs' "business" was operated at various times in both Manhattan and Los Angeles, "under a variety of United States-based corporate entities, including Bad Boy Entertainment, Combs Enterprises, and Combs Global (collectively, the 'Combs Business')."  *Id.* at ¶ 2.

62.     According to the indictment, "[p]hysical abuse by [Combs] was recurrent and widely known."  *Id.* at ¶ 4.  It notes that Combs' assaults on women included "striking,

---

[1] All allegations in the indictment are incorporated by reference herein.

punching, dragging, throwing objects at, and kicking them." *Id.*  Combs was also charged with "us[ing] the Combs Business, including certain employees, to carry out, facilitate, and cover up his abuse and commercial sex" and the indictment notes that his employees' conduct "was facilitated and assisted by Combs' control of the Combs Business." *Id.* at ¶ 5.  The indictment specifically refers to the involvement of "Combs' security staff," likely referring to Sherman.  *Id.* It notes that Combs and his affiliates recorded sexual assaults and controlled victims through the use of drugs.  *See id.* at ¶ 12.  In or about March 2024, law enforcement seized narcotics and more than 1,000 bottles of baby oil and lubricant from Combs' residences.  *Id.*

63.     Combs' long history of violence against women makes unmistakably clear that his actions, including his attack of Plaintiff, have been motivated by gender.  Specifically, he has a profound contempt for women and an ongoing practice of denigrating and trying to humiliate them.

64.     Combs' treatment of Plaintiff accords with his pattern and practice of drugging, raping, and secretly recording the women he is abusing.

### FIRST CAUSE OF ACTION
### (Violation of New York City Victims of Gender-Motivated Violence Protection Act)
### (All Defendants)

65.     Plaintiff hereby incorporates each of the foregoing paragraphs as if fully set forth herein.

66.     By viciously and violently forcing sexual contact, oral sex, anal sex, and sexual intercourse on Plaintiff, Defendants Combs and Sherman committed a "crime of violence motivated by gender" under the Victims of Gender-Motivated Violence Protection Act ("VGMVPA") as defined in New York City Administrative Code § 10-1103.

67.    The requirement that the crime of violence be committed because of gender or on the basis of gender, and due, at least in part, to an animus based on the victim's gender is satisfied because Defendants Combs and Sherman violently forced Plaintiff to engage in vaginal intercourse, and oral and anal sex without her consent. Gender animus inheres when consent is absent. Moreover, Combs' long history of violence against women evinces a deep contempt for women, as does Sherman's alleged pattern of committing his own sexual assaults, recording them, and selling them as pornography.

68.    Defendants Combs' and Sherman's rapes of Plaintiff presented a serious risk of physical injury to her and in fact caused her significant physical injuries including burning and pain in her vagina and anus, anal bleeding, and bruising to her face and wrists.

69.    The Combs Corporations enabled Combs and/or Sherman to commit the crime of violence motivated by gender because Combs and Sherman raped Plaintiff at the Bad Boy studio, where on information and belief they routinely committed sexual assault and gender-motivated violence, as detailed in other civil lawsuits. Given Combs' and Sherman's long-standing pattern and practice of committing sexual violence against women, including at the same location where they raped Plaintiff, the Combs Corporations had and/or should have had knowledge of Combs and Sherman using the premises for this unlawful conduct, and did nothing to stop it.

70.    The Combs Corporations enabled Combs and/or Sherman to commit the crime of violence motivated by gender by failing to, among other things, protect Plaintiff from a known danger and/or have sufficient policies and procedures in place to prevent sexual assault and/or train their employees on identifying and preventing sexual assault. Given Combs' and Sherman's long-standing pattern and practice of committing sexual violence against women,

including on premises owned and/or operated by Defendants, the Combs Corporations had

and/or should have had knowledge that Combs and Sherman were a danger to Plaintiff, and did

nothing to stop Combs and Sherman.

71.     The Combs Corporations enabled Combs and/or Sherman to commit the crime of

violence motivated by gender by failing to properly supervise Combs and/or Sherman.  Further,

Combs, as the owner of Bad Boy and Daddy's House, watched Plaintiff being raped by his

employee, on the premises of Bad Boy.  The Combs Corporations had knowledge and/or should

have had knowledge of Combs' widespread and well-known practice of committing sexual

assault and gender-motivated violence, including on premises owned and/or operated by

Defendants, and did nothing to stop it.

72.     The Combs Corporations further enabled Combs and/or Sherman to commit the

crime of violence motivated by gender by actively placing, maintaining, and/or employing

Combs and/or Sherman in positions of power and authority, despite the fact that they knew

and/or should have known that Combs had a widespread and well-known practice of committing

sexual assault and gender-motivated violence, including on premises owned and/or operated by

Defendants.  Combs and Sherman used their titles and authority conferred by the Combs

Corporations, including as CEO, Founder, and Chairman (Combs) and Head of Security

(Sherman), to facilitate and perpetuate the violent assault on Plaintiff, and to intimidate and force

Plaintiff to keep quiet in subsequent years.

73.     The Combs Corporations also enabled Combs and/or Sherman to commit the

crime of violence motivated by gender because Combs and Sherman used Plaintiff's boyfriend's

employment as an executive for Bad Boy and Daddy's House, and their stated concerns about his

performance at work, to lure Plaintiff out of her home to meet with them alone.

74.     On information and belief, Plaintiff alleges that Defendant Organizational Does 1 through 10, inclusive, are other parties not yet identified who have enabled Combs and/or Sherman to commit the crime of violence motivated by gender, in the ways articulated above and/or in other ways.

75.     As a result of Defendants' actions, Plaintiff suffered damages in an amount to be determined at trial and pursuant to the fee-shifting provision of the statute.

76.     This legal action has been commenced within the statutory timeframe provided by the two-year look-back window for VGMVPA claims.  *See* New York City Administrative Code § 10-1105.

## SECOND CAUSE OF ACTION
### (Violation of New York Civil Rights Law § 52-B)
### (Combs and Sherman)

77.     Plaintiff hereby incorporates each of the foregoing paragraphs as if fully set forth herein.

78.     By raping Plaintiff and recording it, Defendants caused Plaintiff to be depicted in a video image unclothed and with intimate body parts exposed, and engaging in sexual conduct with another person in violation of New York Civil Rights Law § 52-B.

79.     Defendants published and/or disseminated the video without Plaintiff's knowledge or consent.  On information and belief, Defendants have continued to disseminate the video, including by selling it as pornography, through the present.

80.     Plaintiff was fully identifiable in the video.

81.     Plaintiff had a reasonable expectation that Defendants would not secretly record a violent rape of her and disseminate the video to others.

82.    By intentionally publicly humiliating Plaintiff and trying to ruin Plaintiff's romantic relationship with her then-boyfriend when they published the video, Defendants had the purpose of harassing, annoying, and/or alarming Plaintiff.

83.    As a direct and proximate result of Defendants' actions in violation of New York Civil Rights Law § 52-B, Plaintiff has suffered and continues to suffer emotional harm, including mental anguish, emotional distress, and humiliation in an amount to be determined at trial.

84.    Defendants' violations of New York Civil Rights Law § 52-B were malicious, willful, wanton, and outrageous, entitling Plaintiff to an award of punitive damages.

85.    Defendants should be ordered to account for and destroy all copies of the video that are in their actual or constructive possession, custody, or control.

86.    Defendants should be temporarily and permanently enjoined from further disseminating or publishing any intimate images of Plaintiff.

### THIRD CAUSE OF ACTION
**(Violation of New York City Administrative Code § 10-180)**
**(Combs and Sherman)**

87.    Plaintiff hereby incorporates each of the foregoing paragraphs as if fully set forth herein.

88.    By recording and showing others the video of themselves violently raping Plaintiff, Defendants disclosed an intimate image of Plaintiff without her consent in violation of New York City Administrative Code § 10-180.

89.    Defendants are covered recipients because they recorded and/or caused the video to be recorded themselves.

90.    On information and belief, Defendants have continued to disseminate the video, including by selling it as pornography, through the present.

91.     Such intimate images depicted Plaintiff unclothed and with intimate body parts exposed, and engaging in sexual conduct with another person, in violation of § 10-180.

92.     Plaintiff was fully identifiable in the video.

93.     Plaintiff had a reasonable expectation that Defendants would not secretly record a violent rape of her and disseminate the video to others and certainly did not intend for the recording to be disclosed to anyone.

94.     Defendants intentionally disclosed and disseminated the video to Plaintiff's then-boyfriend and others without Plaintiff's consent with the intent to publicly humiliate Plaintiff and ruin her relationship with her then-boyfriend, causing her economic, physical, and/or substantial emotional harm.

95.     Defendants' intention in disseminating and publishing the video was to harass, annoy, alarm, and humiliate Plaintiff, and to cause her economic, physical, and/or substantial emotional harm.

96.     As a direct and proximate result of Defendants' actions in violation of New York City Administrative Code § 10-180, Plaintiff has suffered and continues to suffer emotional harm, including mental anguish, emotional distress, and humiliation in an amount to be determined at trial.

97.     Defendants' violations of New York City Administrative Code § 10-180 were malicious, willful, wanton, and outrageous, entitling Plaintiff to an award of punitive damages.

98.     Defendants should be ordered to account for and destroy all copies of the video that are in their actual or constructive possession, custody, or control.

99.     Defendants should be temporarily and permanently enjoined from further disclosing and disseminating any intimate images of Plaintiff.

WHEREFORE, Plaintiff respectfully requests that judgment be entered against Defendants as follows:

     a.  Awarding compensatory damages for all physical injuries, emotional distress, psychological harm, anxiety, humiliation, physical and emotional pain and suffering, family and social disruption, and other harm, in an amount to be determined at trial;

     b.  Awarding punitive damages in an amount to be determined at trial;

     c.  Awarding attorneys' fees and costs pursuant to any applicable statute or law, including under New York City Administrative Code § 10-1104, New York Civil Rights Law § 52-B(2), New York City Administrative Code § 10-180, and any other applicable statute or law;

     d.  Awarding pre- and post-judgment interest on all such damages, fees, and/or costs;

     e.  Attaching any and all of Defendants' real property and other assets located in the State of New York pursuant to Federal Rule of Civil Procedure 64;

     f.  Ordering Defendants to account for and destroy all copies of any and all images and videos taken of or in connection with Combs' and Sherman's sexual assault of Plaintiff that are in their actual or constructive possession, custody, or control, and enjoining Defendants temporarily and permanently from further disseminating or publishing any intimate images or videos of Plaintiff; and

     g.  Awarding such other and further relief as this Court may deem just and proper.

Dated: New York, New York
       September 24, 2024

CUTI HECKER WANG LLP

By: *Mariann Wang*
        Mariann Meier Wang
        Heather Gregorio
        Jazly Liriano
        305 Broadway, Suite 607
        New York, New York 10007
        (212) 620-2603
        mwang@chwllp.com
        hgregorio@chwllp.com
        jliriano@chwllp.com

ALLRED, MAROKO & GOLDBERG
        Gloria Allred
        305 Broadway, Suite 607
        New York, New York 10007

*Attorneys for Plaintiff*